# Composite Exhibit 1

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURIDISCTION DIVISION

CASE NO. 13-020307 CA 15

ROYAL CARIBBEAN CRUISES LTD.,

     Plaintiff,

vs.

HUGE, LLC,

     Defendant.

_____/

## COMPLAINT

Plaintiff Royal Caribbean Cruises Ltd. ("Royal Caribbean") sues Defendant Huge, LLC ("Huge") and alleges as follows:

1.    This is an action for breach of contract that seeks damages in excess of $15,000, exclusive of interest, attorneys' fees, and costs.

2.    Royal Caribbean is a Liberian corporation having its principal executive offices in Miami, Florida.

3.    Huge is a New York limited liability company having its principal place of business in Brooklyn, New York.

4.    All of Huge's members are citizens of states other than Florida.

5.    The exercise of personal jurisdiction over Huge is appropriate because Huge's President traveled to Royal Caribbean's offices in Miami to negotiate the Statement of Work entered into by the parties, which is the agreement giving rise to this action. After the parties entered into the Statement of Work, Huge's Vice President of Client Services travelled to Royal

Caribbean's Miami and Miramar, Florida offices (the "South Florida Offices") to attend monthly meetings regarding the project, and the performance and implementation of the parties' contract. Huge's technical personnel traveled to Royal Caribbean's South Florida Offices to attend numerous design and developmental meetings regarding the project, and the performance and implementation of the parties' contract. Huge delivered the defective website code (as addressed below) to Royal Caribbean at Royal Caribbean's South Florida Offices. The redesigned website that Huge contracted to provide Royal Caribbean, but failed to provide, was to be launched and operated from Royal Caribbean's South Florida Offices. Huge sent numerous telephonic and electronic communications to Royal Caribbean's South Florida during the course of attempting to perform under the parties' agreement.

6.       Venue is appropriate in this circuit.

7.       Any and all conditions precedent to instituting this action have occurred, or have been performed or waived.

8.       Royal Caribbean operates the Royal Caribbean International brand of cruise ships.

9.       Royal Caribbean owns and maintains an Internet website for the Royal Caribbean International brand of ships (the "Website"). The Internet address for the Website is www.royalcaribbean.com.

10.      The Website is one of the primary ways in which consumers located in the United States and in many other countries around the world can learn more about Royal Caribbean International, its cruise ships, and the itineraries its ships sail. Depending on a consumer's location in the world, the Website allows consumers to purchase cruises, and allows ticketed passengers to check-in for their cruises prior to departure and also reserve and purchase ship and

2

shoreside amenities and activities during the cruise. Much of the advertising for Royal Caribbean International contains a "call to action" inviting consumers to visit the Website.

11.     Put simply, the Website is, in many ways, the front door for Royal Caribbean International. Its look, feel, functionality, technical capabilities, availability, and seamless operation are vital to providing a positive online experience that will attract and retain consumers. Many consumers' first interaction with and exposure to Royal Caribbean International is through the Website, and more consumers experience the Royal Caribbean International brand through the Website than actually board the ships. The Website experienced over thirty-five million unique visitors in 2012.

12.     Royal Caribbean and Huge entered into a Master Services Agreement (the "MSA"). A copy of the MSA is attached as Exhibit 1.

13.     The MSA recited that Royal Caribbean might, "from time to time," retain Huge to provide Royal Caribbean with various website related services.

14.     The MSA set out the terms and conditions governing the relationship between Royal Caribbean and Huge.

15.     The MSA contemplated that when, in the future, Royal Caribbean required specific services, Royal Caribbean and Huge would enter into a Statement of Work for those specific services.

16.     Any such Statement of Work, in combination with the MSA, would constitute a separate agreement between the parties and would be referred to as a Work Agreement.

17.     Royal Caribbean and Huge entered into a Statement of Work (the "SOW") for the redesign of the Website. The SOW, which is Exhibit 2 to this Complaint, is being filed under seal.

3

18.     The Effective Date of the SOW was May 1, 2011, and it was signed by Royal Caribbean and Huge.

19.     The redesign of the Website was comprised of discrete services, tasks, and "deliverables" that Huge was required to complete and provide.  The SOW identified those services, tasks, and deliverables, and established the deadlines by which Huge was required to complete and provide each one.  As shown in the SOW, this was a customized project.

20.     The SOW established June 17, 2012 as the Release Date for the redesigned Website.  In other words, that was the date by which Huge was required to have completed all of its work such that the redesigned Website would be fully-operational and ready for use by the public and Royal Caribbean.

21.     In the SOW, Royal Caribbean agreed to pay Huge a total of $11,498,436.97.  The SOW contains an invoicing and payment schedule for that amount.

22.     Through §8.2(b) of the MSA, Huge warranted that its work "shall be of high quality and free of defects in material and workmanship in all material respects."

23.     From time to time after the SOW was executed, the parties agreed – orally and in writing – to various changes in the scope of the work to be performed by Huge.  The nature and details of those changes is not material to the claim asserted in this action.

24.     As a result of those change orders, the total amount that Royal Caribbean agreed to pay Huge was $11,730,676.47.

25.     In November 2011, Huge informed Royal Caribbean that it would be unable to complete and deliver the redesigned Website by June 17, 2012.  After discussions with Huge, Royal Caribbean agreed to extend the Release Date by approximately one month.

26.     A significant part of what Huge was required to deliver to Royal Caribbean under the SOW was website code.

27.     Reduced to its essence, the website code is the electronic programming that would redesign the Website and make it "work."

28.     By mid-June 2012, Huge was aware that Quality Assurance testing of the website code it had developed as of that time revealed approximately 800 defects in the code.

29.     Huge informed Royal Caribbean that it could not complete the redesigned Website by the extended Release Date.  After discussions with Huge, Royal Caribbean agreed to multiple, further extensions of the Release Date, with the final such extension setting the Release Date as December 2012.

30.     Huge did not complete or deliver to Royal Caribbean the redesigned Website required by the SOW in or before December 2012.

31.     Based on the last version of the website code that Huge developed, which was in December 2012, there are over 950 defects in the code.  Royal Caribbean identified those defects and gave notice of them to Huge.

32.     The defects are such that the code is unusable and incapable of running the redesigned Website required by the MSA and SOW.

33.     To date, Huge has not delivered to Royal Caribbean the redesigned Website required by the MSA and SOW.

34.     Royal Caribbean has paid Huge $10,209,457.80.

35.     Huge's failure to deliver, in or before December 2012, the redesigned Website required by the MSA and SOW is a breach of contract.

36.     By letter dated March 27, 2013, and pursuant to §5.2(b) of the MSA, Royal Caribbean provided Huge with notice that its failure to remedy the defects in the website code and to deliver a functioning redesigned Website constituted material breaches of the MSA and SOW which, collectively, are the Work Agreement.  The letter gave Huge thirty days to cure those breaches.

37.     Through that letter, Royal Caribbean terminated the MSA, with such termination to become effective thirty days from the date of the letter.

38.     Huge did not cure the breaches within thirty days after its receipt of the March 27 letter.

39.     Royal Caribbean has been damaged as a result of Huge's breaches.  Royal Caribbean paid for a redesigned Website that it did not receive, and it will incur expenses in retaining someone else to fix the defective Website that Huge provided Royal Caribbean.

WHEREFORE, Royal Caribbean demands that judgment be entered in its favor, and that it be awarded money damages, attorneys' fees, costs, interest, and any additional relief deemed appropriate.

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Royal Caribbean
701 Brickell Avenue
Suite 3000
Miami, Florida 33131
(305) 374-8500 (telephone)
(305) 789-7799 (facsimile)


By: /s/  Scott D. Ponce
  Sanford L. Bohrer (FBN 160643)
  Primary E-mail: sbohrer@hklaw.com
  Secondary E-Mail 1: sponce@hklaw.com
  Secondary E-Mail 2: estarling@hklaw.com
  Scott D. Ponce (FBN 0169528)
  Primary E-Mail: sponce@hklaw.com
  Secondary E-Mail 1: sbohrer@hklaw.com
  Secondary E-Mail 2: estarling@hklaw.com

#23039963_v2

# EXHIBIT 1

# MASTER SERVICES AGREEMENT: WEBSITE RELATED SERVICES

This Master Services Agreement ("Agreement"), dated as of the 23rd day of September, 2010 (the "Effective Date"), is made by and between

> **ROYAL CARIBBEAN CRUISES LTD.**, a Liberian corporation d/b/a Royal Caribbean International ("Company" or "RCL"), with offices at 1050 Caribbean Way, Miami, Florida 33132,

and

> **HUGE LLC**, a New York limited liability company ("HUGE" or "Developer"), with offices on 45 Main Street, Suite 220, Brooklyn, New York 11201.

<em>RECITALS</em>

**WHEREAS**, RCL is engaged in the business of, directly or indirectly, operating a cruise line under the brand name Royal Caribbean International that provides cruising services to the public throughout the world; and

**WHEREAS**, Developer provides certain web design, development, production, marketing, consulting, maintenance or other interactive agency services; and

**WHEREAS**, RCL may agree from time to time to retain Developer to provide to the Royal Caribbean International brand selected services offered by Developer; and

**WHEREAS**, to simplify the process of, and reduce the time and cost of, contract negotiations between RCL and Developer, the Parties have elected to enter into this Master Agreement.

**NOW, THEREFORE**, in consideration of the premises and respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**Article 1.    MASTER AGREEMENT, STATEMENTS OF WORK AND CHANGE CONTROL.**

*Section 1.1    Statements of Work.*

From time to time, RCL may request and Developer may agree to perform one or more of the services listed in a SOW and deliver web pages, software, reports or other deliverables subject to the terms and conditions of this Master Agreement. In that event, the parties shall set enter into a written professional statement of work (each a. "Statement of Work" or "SOW") signed by authorized representatives of both parties. For the avoidance of doubt, an authorized representative of RCL must be a Vice-President or higher level employee of RCL.

Each SOW shall set forth, at a minimum:

    a.   the specific services to be performed pursuant to that SOW (the "Services");

b.  the software, web pages, content, reports or other deliverables (the "Deliverables") to be provided;

c.  the schedule or timetable pursuant to which the Services and Deliverables will be provided;

d.  the fees ("Service Fees") due to Developer for such Services and Deliverables; and

e.  the specifications pursuant to which the Software will be provided or created (the "Specifications").

A SOW will not be binding unless and until it is executed by both parties. When signed by authorized representatives of both Developer and RCL, a SOW will constitute a firm commitment and its terms will be demonstrative of mutual assent on the part of both parties.

Each SOW, in combination with the terms of this Master Agreement, shall constitute a separate agreement between the parties.  Each such separate agreement may be referred to herein as a "Work Agreement." In the event of any conflict or inconsistency between the terms and conditions in a SOW and the terms and conditions of this Master Agreement, the terms and conditions of this Master Agreement shall govern unless the SOW expressly identifies the provision(s) of the Master Agreement that is being modified by the SOW.

*Section 1.2    Creative Control.*

RCL shall retain absolute editorial and creative control over the design and all content of all Deliverables.  Developer agrees to perform, and to cause its employees and agents to perform and provide, all Services and Deliverables in consultation and coordination with RCL in accordance with the schedule and the standards set forth in the applicable SOW. All content, design, and other elements of the Services and Deliverables shall be subject to RCL's prior approval, and RCL may approve or reject any such element at any stage, in accordance with the terms and standards set forth in the applicable Work Agreement.

*Section 1.3    Change Order.*

Without limiting the foregoing, RCL may alter or modify the scope of the Services or Deliverables required by issuing and/or approving a written change order; provided, however, that to the extent such alteration or modification results in extra time, materials or costs to Developer, such change order shall only be effective upon the agreement of the parties in a written amendment to the applicable Work Agreement.  A change order shall not be required for immaterial changes that do not materially affect the scope of Services, deliverables or timing for the project.

*Section 1.4    Exclusivity.*

During the Term and for a period of three (3) months after its expiration or termination, Developer shall not provide any other cruise line or Sandals Resorts, Super Clubs, Breezes Resorts, Club Med, or Barcelo Resorts (collectively, "Competitive Entities") with any services or license grant(s) similar to those services being provided hereunder to RCL without the prior written approval of RCL.  Further, for a period of one year after the expiration or termination of this Agreement, no Developer personnel (with the exception of executive management staff, defined as VP's and above, but excluding Michael Claypool, VP Client Services, who will be bound by the restriction) who are assigned to perform Services for RCL ("Developer Personnel") shall be assigned to perform services or support any Competitive Entities.

*Section 1.5     Compliance with RCL IT Policies.*

Developer shall comply with the terms and obligations of RCL's Vendor Compliance Policy, as may be amended from time to time, and attached as **Exhibit A** hereto.

**Article 2.     TERM.**

This Master Agreement shall commence on the Effective Date.   Unless earlier terminated as provided in this Master Agreement, this Master Agreement shall automatically renew for successive one-year periods.

Unless earlier terminated in accordance with the termination rights set forth in this Master Agreement, the term of each Work Agreement shall be as set forth in the applicable SOW.  If the Master Agreement terminates or expires but a Work Agreement has not, that Work Agreement (including the terms incorporated by reference from the Master Agreement) shall continue through its applicable term.

**Article 3.     RCL SUPPLIED CONTENT.**

As expressly specified in the applicable SOW, RCL shall:  (a) provide to HUGE, at RCL's own expense, the specific content or materials specified in that SOW for incorporation or use in connection with the Deliverables and/or Services ("RCL Supplied Content").   RCL Supplied Content may include, but is not necessarily limited to, RCL's names, logos and related trademarks.

Any delay or failure to provide RCL Supplied Content may cause HUGE's deliverables or phases to be extended on a day-for-day basis until such RCL Supplied Content is provided.  Unless otherwise stated in the applicable SOW, RCL shall be responsible, for:

    a.   procuring at its own expense all necessary rights, licenses, permissions, waivers, releases and other documentation to permit use of all RCL Supplied Content for the purposes specified in the applicable SOW;

    b.   all required payments to third parties for the use of the RCL Supplied Content;

    c.   approving and taking responsibility for claims or representations made with respect to its own and competitive products or services in the RCL Supplied Content.

Except as otherwise expressly provided in the applicable SOW, RCL shall be responsible for reviewing all materials prepared under this Master Agreement in order to ascertain that: (i) all claims or representations made therein with respect to RCL's own products or services, whether direct or implied, are not deceptive or misleading; and (ii) the accuracy and legality of the descriptions and depictions of any products and /or any competitive products or services.

**Article 4.     COMPENSATION, PAYMENT AND EXPENSES.**

*Section 4.1     Definitions.*

For purposes of this Agreement,
**"RCL Representative"** shall mean an RCL Vice President or such other person as may be designated in writing by the RCL's Senior Vice President of Marketing.

"Net Costs" shall mean the actual costs charged to Developer by suppliers and other third-party vendors in connection with the servicing by Developer of RCL's account, net of all commissions, rebates and mark-ups, and after deduction of all volume and early payment discounts, make-goods and other credits.

Section 4.2    *Compensation and Payment.*

The compensation due under each Work Agreement as well as the billing and payment schedule for amounts due under each Work Agreement shall be described in the applicable SOW. No other amounts shall be payable by RCL to Developer for any Services or Deliverables or other matters rendered hereunder, except to the extent set forth on a written change order signed by the parties as provided in Section 1.3 above.

The following general billing and payment terms shall apply to any Work Agreement unless otherwise stated in the applicable SOW.

    i. Developer shall bill RCL for the Services upon completion thereof.

    ii. RCL shall pay Developer the fees set forth in the applicable SOW for such Services within thirty (30) days after RCL's receipt of an invoice from Developer.

    iii. All fees hereunder shall be denominated in U.S. dollars and shall be paid by a RCL check, a wire transfer or such other means as may be expressly agreed to in writing by the parties.

    iv. If RCL disputes an invoice, it shall pay the undisputed portion in timely fashion but shall not be obligated to pay the disputed portion until the parties have resolved the disputed amount.

Section 4.3    *Expenses.*

(a) <u>Default Rule.</u>

Except as expressly provided in the applicable SOW or expressly approved as provided in Sections 4.3(b) or 4.3(c) below, each party is solely responsible for any expenses, including but not limited to the costs of equipment and supplies, incurred in connection with the performance of its obligations under the SOW including but not limited to the following:

    (1) local and long distance charges for voice and facsimile transmissions, telegraph, and telefax expenses;

    (2) copying costs;

    (3) postage charges and shipment expenses related to providing Services to RCL;

    (4) any mark-up of any nature by Developer;

    (5) administrative overhead such as staff wages and overtime.

    (6) any expense that is not solely and directly attributable to the provision of Services on RCL's behalf, such as monthly service charges for wireless telephone service for any of the Developer's personnel.

(b) <u>Travel Expenses.</u>

To the extent RCL has agreed in writing to reimburse Developer for travel, lodging or meal expenses, the following provisions shall apply:

    1. RCL will reimburse Developer at Net Cost for all reasonable traveling and living expenses incurred by Developer in servicing RCL's account hereunder, subject to the following:

i.   Developer obtains the prior approval of RCL;

ii.   all reimbursable travel and lodging accommodations shall be booked directly by RCL's Corporate Travel department;

iii.   all reimbursable air transportation booked by Developer shall be booked coach class, unless otherwise approved in each instance by the RCL;

iv.   the number of Developer staff attending shall first be approved by RCL; and

v.   Developer reimbursable expenses shall otherwise be in accordance with the RCL's internal policy on travel and entertainment.

(c)   Approvals.

(i)   Approval of Third Party Supplier Agreements.

To the extent Developer requests that RCL reimburse Developer for any third party expenses, Developer shall obtain the written approval of the RCL Representative prior to entering into any commitments or obligations with any such third party.   The approval of any such commitment or obligation shall be in writing and signed by the RCL Representative.

RCL shall not be responsible for the payment of overtime or rush charges unless it has approved the overtime or rush charges in writing, in advance.   Developer shall take reasonable steps to ensure that RCL is receiving the lowest price for the third party supplier provided services, including soliciting bids whenever practical.   All third party provided services will be provided to RCL at the Developer's cost, with no mark-up by the Developer, and will be at the lowest cost that the Developer procures the same services from the third party.   The Developer will pass through to RCL all discounts, volume incentives and rebates or price reductions of any nature that the Developer receives from that third party, regardless of when such price reduction is received by the Developer.

(ii)   Changes to Previously Granted Approval.

RCL reserves the right to modify, reject and cancel or discontinue (hereinafter referred to as "Alter") any and all agreements entered into by Developer on RCL's behalf, as well as all plans, schedules or work in progress, and Developer shall immediately take proper steps to carry out such instructions.   In return, RCL agrees (i) to assume any liability for all such Altered commitments, and (ii) to pay Developer in accordance with the provisions of this Agreement, and for all proper charges earned and incurred by Developer in connection with such agreements, up to the time they are Altered.

(d)   Payment.

Unless otherwise provided in the applicable SOW, within thirty (30) business days after the end of each month during the term of a Work Agreement, Developer shall separately invoice RCL for any expenses that are reimbursable as described in this Section 4.3(d).   Such invoice shall include such supporting documentation, including but not limited to receipts for expenses of $25.00 or more, as may be reasonably requested by RCL.

Any undisputed portion of an invoice shall be paid by RCL within thirty (30) days of receipt of such invoice and the required support documentation.   Any undisputed portion of an invoice that has not

been paid within thirty (30) days after receipt of the invoice and required supporting documentation, shall be subject to a finance charge of one and a half (1.5%) percent per month (or the maximum allowed by law if less) on the unpaid portion of that invoice due to Developer.

*Section 4.4    Taxes.*

Except as otherwise expressly provided in the Work Agreement, Developer agrees to pay the full amount of any and all taxes, levies or charges (including without limitation, any penalties or interest thereon) howsoever denominated, imposed or levied against Developer by any law, rule or regulation now in effect including without limitation, sales, use, property and excise or other similar taxes, licenses, import permits or fees, and customs duties relating to or imposed upon purchases of technology or materials by Developer for performing the Services.

*Section 4.5    Late Fee.*

HUGE reserves the right to charge Company a late payment penalty of one percent (1.0%) per month on overdue accounts. However, in no event will the rate charged to Company be higher than the maximum rate allowable under applicable law. The foregoing shall be without prejudice to other rights or remedies available to either party at law or equity.

**Article 5.    TERMINATION.**

*Section 5.1 Termination Without Cause.*

   a.  Of Master Agreement.

After the first year anniversary of the Effective Date, either party may terminate this Master Agreement at any time without cause upon thirty (30) days prior written notice to the other party. Such termination shall not affect any Work Agreement(s) in existence at the time of such termination.

   b.  Of A Work Agreement.

RCL may terminate a Work Agreement without cause only as provided in the applicable SOW.

   (a)    Of Maintenance Services.

Unless otherwise specified in the applicable SOW, RCL may terminate provisions of a Work Agreement calling for the providing of maintenance services without cause upon at least thirty (30) days prior written notice. In that event, the annual maintenance fee due under that Work Agreement shall be pro-rated with respect to the period in which the termination occurred based on the length of time between the commencement of the period and the termination date.

*Section 5.2 Termination Upon Default.*

   a.  Of Master Agreement.

Any party may terminate this Master Agreement immediately upon notice if a party shall:

     i.    apply for or consent to the appointment of a receiver, trustee or liquidator of all or a substantial part of its assets;

     ii.    be unable or fail to pay or admit in writing its inability or failure to pay its debts as they mature;

     iii.    make a general assignment for the benefit of creditors;

iv.  be adjudicated a bankrupt or insolvent or be involved in a proceeding to have it adjudicated as bankrupt, insolvent or dissolved;

v.  file a petition in bankruptcy or for reorganization or for an arrangement pursuant to a bankruptcy act or any insolvency law;

vi.  the making by a party of a general assignment for the benefit of creditors; or

vii.  the appointment of a general receiver or trustee in bankruptcy of a party's business or property; or

viii.  file an answer admitting the material allegation of, or consenting to, or defaulting in answering a petition filed against it, in any bankruptcy, reorganization or insolvency proceeding.

b.  Of Work Agreement

This Section 5.2(b) specifies the general termination conditions that apply to the termination of a Work Agreement.  The termination of a Work Agreement shall not terminate any other Work Agreement in existence as of the effective date of such termination unless so specified in the applicable SOW or this Master Agreement.

At any time during the term of a Work Agreement, a party may terminate the Work Agreement by providing written notice to the other party in case of an "Event of Default" by the other party.  An "Event of Default" shall occur:

ix.  thirty (30) days after a party's receipt of notice that such party is in material breach of any of the terms or conditions set forth in such Attachment, unless such party cures such breach within said thirty (30) day period;

x.  The making by a party of any statement, representation or warranty in this Agreement which shall prove to be knowingly or recklessly untrue or incorrect in any material respect, when made; or

xi.  immediately if the other party has done one or more of the items described in Section 5.2(a) above.

Section 5.3    Cross-Defaults.

A material breach by a party of an obligation under this Master Agreement, or a Work Agreement which would entitle the non-breaching party to terminate a Work Agreement pursuant to Section 5.2(b) above shall also constitute grounds for the non-breaching party to terminate any or all other Work Agreements upon thirty (30) days prior written notice.

Section 5.4    Effect of Termination of the Agreement.

Upon any termination of a Work Agreement, Developer shall return any and all RCL materials provided by RCL in connection with that Work Agreement.  If RCL terminates this Agreement, Developer shall deliver to RCL all deliverables in their then current stage of development.  RCL shall only be obligated to pay Developer the pro-rated fees and compensation for work performed

up to and including the date of termination as well as any authorized expenses and authorized non-cancellable commitments.

**Article 6.   DEVELOPER SUPPLIED CONTENT: EQUIPMENT, SUPPLIES, THIRD PARTY TECHNOLOGY AND CONTENT.**

*Section 6.1    Developer Supplied Content.*

As expressly specified in the applicable SOW, Developer shall provide to RCL, at Developer's own expense, the Deliverables and/or Services, including but not limited to any graphics, images, music, text, software code or other items incorporated therein. Collectively any items incorporated into the Deliverables or Services (excluding RCL Supplied Content) may be referred to herein as "Developer Supplied Content".

Unless otherwise stated in the applicable SOW, Developer shall be responsible, for:

    a.  procuring at its own expense all necessary rights, licenses, permissions, waivers, releases and other documentation to permit use of all Developer Supplied Content for the purposes specified in the applicable SOW; and

    b.  all required payments to third parties for the use of the Developer Supplied Content.

*Section 6.2    Third Party Works Defined.*

    c.  As used in this Master Agreement and the SOW(s), the following terms shall have the following meanings.

**"Third Party Content"** shall mean any and all video, graphics, photographs, animation, text, audio or other content that is owned or otherwise controlled by any third party other than a subsidiary or affiliate of Developer.

**"Third Party Technology"** shall mean any software or other technology owned or otherwise controlled by any third party other than a subsidiary or affiliate of Developer.

Collectively the "Third Party Content" and "Third Party Technology" may be referred to herein as the **"Third Party Works."**

**Article 7.   OWNERSHIP AND RIGHTS.**

*Section 7.1    Ownership of Work Product by RCL.*

Except as set forth in this Article 7, all elements of all Deliverables shall be exclusively owned by RCL and shall be considered works made for hire by Developer for RCL. Except as set forth below, RCL shall exclusively own all United States and international copyrights and all other intellectual property rights in the Deliverables.

*Section 7.2    Vesting of Rights.*

With the sole exception of any Developer Works (as defined in Section 7.3 below) or Third Party Works expressly identified in the applicable SOW, Developer agrees to assign, and upon creation of each element of each Deliverable automatically assigns, to RCL, its successors and assigns, ownership of all United States and international copyrights and all other intellectual property rights

in each element of each Deliverable. This assignment is undertaken in part as a contingency against the possibility that any such element, by operation of law, may not be considered a work made for hire by Developer for RCL. From time to time upon RCL's request, Developer and/or its personnel shall confirm such assignments by execution and delivery of such assignments, confirmations of assignments, or other written instruments as RCL may request. RCL, its successors and assigns, shall have the right to obtain and hold in its own name all copyright registrations and other evidence of rights that may be available for the Deliverables and any portion(s) thereof.

*Section 7.3    Developer Works.*

All rights in any computer code or materials developed by or for Developer independently of this Agreement that are provided pursuant to this Agreement ("Developer Works") shall remain the sole property of the Developer. RCL agrees that "Developer Works" shall include Developer produced music and sound composition, Developer produced stock footage, proprietary technology, Director, HTML and other code developed by Developer or into which information provided by RCL is translated or converted, features that are not humanly perceptible (including, visually, aurally, and otherwise) during the operation of all Director, HTML and CGI scripts, all software architecture and computer code of any of the foregoing.

Developer hereby grants RCL a non-exclusive, perpetual, fully paid-up license to use, reproduce and modify the Developer Works incorporated into each Deliverable for the purposes set forth in any SOWs, subject to payment in full of the amounts to be paid by RCL pursuant this Agreement for its business operations only and not sublicensing.

*Section 7.4    Third Party Works That Are Developer Supplied Content.*

In the event that any portion of any Deliverable (including the entirety thereof) constitutes both Developer Supplied Content and a preexisting Third Party Works for which Developer cannot grant to RCL the rights set forth in paragraphs 7.1 and 7.2 above, the following provisions shall apply.

1.   Any commercial off-the-shelf product ("Commercial Product") which is provided pursuant to this Agreement shall be licensed to RCL according to the terms of the end user license agreement packaged with such product. Before incorporating any Commercial Product into a Deliverable, Developer shall provide to Company in writing the following information with respect to each such Commercial Product:
   - (1) a description of the Commercial Product;
   - (2) its owner;
   - (3) the Commercial Product's standard terms and conditions of the proposed license to be granted to RCL for such Commercial Product including but not limited to the term of such license, the cost of such license, any restrictions applicable to Developer's or RCL's use of such Commercial Product or RCL's exploitation of the Deliverable as a Derivative Work thereof and the costs for terminating the license grant or any work to be performed by a third party in connection therewith; and
   - (4) any other relevant information.

Developer shall include a Commercial Product in a Deliverable only upon and subject to the terms and conditions set forth in the express written consent of RCL. The license granted to RCL should be worldwide and provide RCL the right and license to use, execute, reproduce, display, perform, distribute and create derivative

works of such Commercial Products for RCL's use only, not for resale to others. At RCL's discretion, it may choose to negotiate licenses for one or more Commercial Product directly with the licensor or other authorized third party.

2. To the extent a Third Party Work does not fall within the definitions of Commercial Product above and Developer cannot obtain for RCL the rights set forth in paragraphs 7.1 and 7.2 with respect to that Third Party Work, that Third Party Work shall be considered to be a "UTPW." Before incorporating any UTPW into a Deliverable, Developer shall provide to Company in writing the following information with respect to each such UTPW:

- (1) a description of the UTPW;
- (2) its owner;
- (3) the UTPW's standard terms and conditions of the proposed license to be granted to RCL for such UTPW including but not limited to the term of such license, the cost of such license, any restrictions applicable to Developer's or RCL's use of such UTPW or RCL's exploitation of the Deliverable as a Derivative Work thereof and the costs for terminating the license grant or any work to be performed by a third party in connection therewith; and
- (4) any other relevant information.

Developer shall include a UTPW in a Deliverable only upon and subject to the terms and conditions set forth in the express written consent of RCL. The license granted to RCL should be worldwide and provide RCL the right and license to use, execute, reproduce, display, perform, distribute and create derivative works of such UTPW for RCL's use only, not for resale to others. At RCL's discretion, it may choose to negotiate licenses for one or more Commercial Product directly with the licensor or other authorized third party.

3. If Company should direct Developer to cancel or terminate any previously authorized purchase or commitment for a Commercial Product or UTPW, Company agrees to assume responsibility for those liabilities described to RCL and approved by RCL as provided in Section 7.4(1) or (2) above.

## Section 7.5    *Rights to Marks and Materials.*

Each party shall retain all right, title and interest in and to its respective trademarks, tradenames, service marks, logos, and other intellectual property rights (the "Marks"), and neither party shall in any way use the Marks of the other without prior written approval. RCL shall retain all right, title and interest in and to any and all photographs, graphics, text, audio, video, and/or other materials provided to Developer in connection with the Services, and Developer shall, promptly upon completion of the Services, return all such materials to RCL.

RCL hereby grants to Developer a non-exclusive, non-transferable, royalty-free license to use, solely in connection with the Services, as applicable, RCL's Marks, and other materials owned, controlled, or licensed by RCL.

**Article 8.   WARRANTIES AND REPRESENTATIONS.**

*Section 8.1   Mutual Representations.*

Each party warrants and represents that: (a) It is duly organized, validly existing and in good standing; (b) It has all necessary power and authority to execute and deliver this Agreement, and to perform its obligations under this Agreement; (c) This Agreement constitutes a valid, legal and binding obligation, enforceable against it, in accordance with its terms; (d) The execution, delivery and performance of this Agreement will not constitute a violation of any law, rule, regulation or court order applicable to it; (e) It has no commitment, express or implied, with any other person, firm or corporation that is in conflict with the terms, conditions and understandings contained in this Agreement; and (f) It has or will obtain and maintain all government licenses, permits and approvals that are necessary or advisable for the implementation of this Agreement and shall throughout the Term of this Agreement comply with all applicable laws, regulations, rules and ordinances.

*Section 8.2   Developer Representations.*

  a.  General

Developer hereby warrants and represents to RCL that: (i) it has the experience, staff, skill and authority to perform the Services; (ii) it is adequately financed to meet any financial obligation it may be required to incur hereunder; (iii) it has obtained all licenses and permits required to observe and perform the terms, covenants, conditions and other provisions on its part to be observed or performed under this Agreement; (iv) that Developer has obtained all necessary consents, permissions or releases, and will timely make all payments to third parties that may be required to provide the Services; and (v) it will not engage any employee of RCL or any RCL affiliate to perform any part of the Services.

  b.  Workmanship.

Developer warrants that it will perform its obligations under this agreement in a professional and workmanlike manner and with professional diligence and skill and that its work, including but not limited to any Deliverables, shall be of high quality and free of defects in material and workmanship in all material respects.

  c.  No Conflict

Developer represents and warrants that it is under no obligation or restriction, nor will it assume any such obligation or restriction that does or would in any way interfere or conflict with, or that does or would present a conflict of interest concerning, the work to be performed by Developer under this Agreement.

  d.  Ownership Rights

Developer represents and warrants that (1) it is and will be the sole author of all works employed by Developer in preparing any and all Deliverables other than Third Party Works; (2) it has and will have full and sufficient right to assign or grant the rights and/or licenses granted in the Deliverables pursuant to this Agreement; and (3) all Deliverables other than Third Party Works have not been and will not be published under circumstances that would cause a loss of copyright therein, and (4) all Deliverables do not and will not infringe any patents, (that are known or should have been known to Developer), copyrights, trademarks, or other intellectual property rights (including trade secrets).

e.  Conformity, Performance, and Compliance

Developer represents and warrants that:

(1) all Deliverables will function with properly configured versions of the Web Browsers specified in the applicable SOW;

(2) all Deliverables will conform to the specifications and functions set forth in this Agreement;

(3) Developer will perform all work called for by this Agreement in compliance with all applicable laws; and

(4) all personnel employed by Developer shall be capable, experienced individuals in light of the tasks they are to perform.

### Section 8.3    *Warranties*

a.  <u>Developer Warranties.</u>

HUGE represents and warrants to Company that:  (a) HUGE is the owner or valid licensee of the Deliverables, and HUGE has secured all necessary licenses, consents, permissions and releases for Company's use of the Third-Party Works as provided in this Agreement, and (b) there are no conflicting claims with respect to HUGE's rights.  HUGE MAKES NO IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT.  Except as provided above, HUGE makes no warranties on any Third-Party Works, including but not limited to software and hardware.

HUGE further represents and warrants that any software used or incorporated into the Deliverables shall be free from defects in workmanship or material under normal use for a period of sixty (60) days after shipment of the software to Company.  Shipment shall be limited to one site (the "Delivery Site"), unless specified otherwise in any Statement of Work.  The foregoing warranty excludes defects arising out of accident, neglect, misuse, failure of electric power, air conditioning, humidity control, Company's negligence, hardware defects or failure, revision by Company or by any third party at Company's direction of software used or incorporated into the Deliverables or causes other than ordinary use.  In the event there is a breach of this warranty, HUGE's sole obligation and Company's sole remedy shall be repair or replacement of the software at the Delivery Site during the warranty period.  Unless otherwise specified in any Statement of Work, Company shall be responsible for purchasing all hardware, and HUGE makes no warranties with respect to the hardware.

Developer represents, warrants and covenants that:

(i)    none of the Deliverables or Services provided hereunder or their use shall infringe upon or violate the intellectual property rights, including without limitation any patent (that is known or should have been known to Developer), copyright, trademark, trade secret or other proprietary right, privacy or similar rights of any person or entity;

(ii)    as of the Effective Date of this Agreement, no claim (whether or not embodied in an action, past or present) of an infringement or other violation described in Section 8.2.f.(i) above been threatened or asserted, nor is such a claim pending against Developer (or, insofar as Developer is aware, against any entity from which Developer has obtained such rights);

(iii)   Developer has or will secure all third party rights, licenses or other permissions necessary to allow Developer and RCL to use and/or incorporate Third Party Technology and Third Party Content;

(iv)   Developer has not previously granted and will not grant any rights in the Developer Works to any third party which are inconsistent with the rights granted and/or assigned to RCL herein;

(v)    Developer has full power to enter into this Agreement, to carry out its obligations hereunder and to grant/assign the rights herein granted/assigned to RCL;

(vi)   subject to the terms of Sections 7.3 and 7.4, upon completion of the development of any and all Deliverables hereunder, RCL shall have unencumbered title or license to such works free and clear of all liens, and

(vii)  Developer has sufficient financing and other resources to fully perform its obligations under this Agreement;

(viii) the Services (other than the RCL Supplier Content) are original or properly licensed from third parties; and

(ix)   Developer has not granted and will not grant to any third party any right that would or might derogate or interfere with any right granted herein to Client.

b.   RCL Warranties.

RCL hereby represents and warrants that:  (a) it is the owner or valid licensee of the RCL Supplied Content and it has secured all necessary licenses, consents, permissions and releases for Developer's use of the RCL Supplied Content; (b) there are no conflicting claims with respect to RCL's rights; (c) use of the RCL Supplied Content pursuant to this agreement shall not infringe the rights of any third party; and (d) the RCL Supplied Content (including all claims, calculations and formulae therein) is and will remain accurate, complete and correct in all material respects.

**Article 9.    CONFIDENTIALITY**

*Section 9.1    Confidentiality Obligations.*

The party receiving ("Receiving Party") the Confidential Information of the disclosing party ("Disclosing Party") agrees to treat the other party's Confidential Information as strictly confidential and shall not, directly or indirectly:  (a) use such Confidential Information for any purpose other than the performance of its obligations under this Agreement; (b) copy or modify such Confidential Information without the prior written consent of the Disclosing Party; or (c) distribute or disclose such Confidential Information to any third party other than to the Receiving Party's Affiliates, employees, directors, agents and independent contractors (collectively, "Representatives") who have a specific need to know the Confidential Information and who are obligated to maintain the Confidential Information in confidence under similar terms and conditions as set forth herein.  The Receiving Party agrees, at its sole expense, to take all reasonable measures to prevent its Representatives from breaching this Agreement and the Receiving Party agrees that it shall be responsible for any breach or threatened breach of this Agreement by any of its Representatives.  The Receiving Party agrees not to sell, transfer, lease, or license the Confidential Information of the Disclosing Party in any manner whatsoever.

*Section 9.2    Exclusions to Confidentiality Obligations.*

The Receiving Party shall not be required to treat as Confidential Information any information or material that the Receiving Party can demonstrate by written documentation:  (a) is or has entered the public domain through no fault of the Receiving Party or its Representatives; (b) is or was

independently developed by or for the Receiving Party without use, directly or indirectly, of the Confidential Information; (c) is or was received by the Receiving Party from a third party on a non-confidential basis, provided that the Receiving Party did not know or should have known that the source of such Confidential Information was not bound by an obligation of confidentiality with respect to such information; or (d) is approved for release by the prior written authorization of the Disclosing Party.

### Section 9.3    Request for Disclosure by Governmental Authority.

In the event that the Receiving Party or any of its Representatives receive a request or demand to disclose all or part of the Confidential Information pursuant to a court order, operation of law, subpoena, requirement of a governmental authority, or otherwise, the Receiving Party agrees to: (a) promptly notify the Disclosing Party of the terms and surrounding circumstances of such request or demand so that the Disclosing Party may seek a protective order, or other appropriate relief and/or waive compliance with the provisions of this Agreement; (b) promptly consult with the Disclosing Party on the advisability of taking steps to resist or narrow such request or demand; (c) in the absence of a protective order or other remedy or the receipt of a waiver from the Disclosing Party and only after the Receiving Party's compliance with (a) and (b) above, minimize the disclosure of the Confidential Information ultimately required to be disclosed to only that Confidential Information which is reasonably necessary to meet the express requirements of the request or demand; and (d) subject to the mutual agreement of the Parties concerning costs and expenses, cooperate with the Disclosing Party to obtain an order or other reliable assurance that confidential treatment will be accorded to any Confidential Information ultimately required to be disclosed after the Receiving Party's compliance with (a) and (b) above.

### Section 9.4    Return of Confidential Information.

Upon any termination of this Agreement, or within ten (10) days after the Receiving Party's receipt of the Disclosing Party's written request, the Receiving Party shall return to the Disclosing Party all tangible materials containing or embodying the Confidential Information, and/or at the specific request of the Disclosing Party, destroy all documents (paper, electronic or otherwise) containing or embodying the Confidential Information unless the Confidential Information is the subject of an effective license pursuant to Article 7 of this Agreement. Notwithstanding the return and destruction of the Confidential Information, the Receiving Party and its Representatives shall continue to be bound by the terms and conditions of this Article 9.

### Section 9.5    Press Release.

Neither Party shall publish or use any advertising, sales promotions, press releases or other publicity which use the other Party's name, logo, trademarks or service marks without the prior written approval of the other Party.

### Section 9.6    Remedy.

The Receiving Party agrees that the breach or threatened breach of any of the terms or conditions of this Article 9 will cause the Disclosing Party and/or the owner of such Confidential Information irreparable injury for which the recovery of money damages would be inadequate. Therefore, the Disclosing Party or such other party shall be entitled to obtain injunctive relief against the breach or threatened breach of this Agreement, in addition to any other remedies the Disclosing Party may have under applicable law and without the necessity of posting a bond, even if otherwise normally required.

**Article 10.   INSURANCE**

At all times during the term of this Agreement and for a period of two years after its expiration or termination, Developer shall maintain the following insurance coverage:

- Workmen's compensation, meeting the statutory requirements of the jurisdiction where the services are to be performed;
- Professional Liability and Errors & Omissions/Privacy Liability Insurance, in an amount of $2,000,000 per wrongful act and annual aggregate, covering acts, errors, omissions, negligence including copyright infringement claims, but excluding patent infringement claims, and including network risks (including coverage for unauthorized access, failure of security, breach of privacy perils, as well as notification costs and regulatory defense) in the performance of services for RCL or on behalf of RCL hereunder.
- Commercial general liability insurance with limits of $1,000,000 for each occurrence; and
- Automobile liability for a limit of $1,000,000.

Upon request, Developer shall provide to RCL certificates of insurance of the existence and extent of said insurance.

**Article 11.   INDEMNIFICATION; LIMITATION OF LIABILITY**

A.    Except to the extent proximately caused by Company or which arises under Company's indemnity obligations below, HUGE will defend and indemnify Company from and against any loss, damage, liability, claim, demand, suit and expense, including reasonable attorneys' fees (collectively, "Loss") that may be incurred by Company as the result of third party claims brought or threatened against Company and arising out of HUGE's breach of its warranties and representations and obligations hereunder in providing the Services to Company.

B.    Company shall be responsible for the accuracy, completeness and propriety of information concerning its organization, products, services, and competitors' products and services that Company furnishes to HUGE in connection with the Services.  Accordingly, Company shall indemnify and hold HUGE harmless from and against any Loss that may be incurred by HUGE as the result of any claim, suit or proceeding made or brought against HUGE by any third party, including any governmental agency, which arises out of or in connection with (i) the RCL Supplied Content or any other material prepared by Company or anyone acting on Company's behalf; or (ii) any product liability claims arising from any third party use of Company's products or services; and (iii) Company's breach of its warranties and representations hereunder.

C.    NOTWITHSTANDING ANYTHING TO THE CONTRARY, THE MAXIMUM AGGREGATE LIABILITY OF DEVELOPER TO RCL OR RCL TO DEVELOPER FOR CLAIMS RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE SERVICES, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, SHALL NOT EXCEED THE TOTAL AMOUNT OF ALL FEES DUE TO AGENCY (EXCLUDING FEES PAID TO SUBCONTRACTORS AND OTHER THIRD PARTIES). NOTWITHSTANDING THE FOREGOING, THERE ARE NO LIMITATIONS OF LIABILITY FOR BREACH OF CONFIDENTIALITY, WILLFUL OR GROSS NEGLIGENCE, OR THE INDEMNITIES ABOVE. IN NO EVENT SHALL EITHER PARTY BE LIABLE, WHETHER UNDER CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL OR SPECIAL

DAMAGES, EVEN IF THAT PARTY IS NOTIFIED IN ADVANCE OF SUCH POSSIBILITY, ARISING OUT OF OR PERTAINING TO THE SUBJECT MATTER OF THIS AGREEMENT.

D.      Upon the assertion of any claim or the commencement of any suit or proceeding against an indemnitee by any third party that may give rise to liability of an indemnitor hereunder, the indemnitee shall promptly notify the indemnitor of the existence of such claim and shall give the indemnitor a reasonable opportunity to defend and/or settle the claim at its own expense and with counsel of its own selection. The indemnitee shall make available to the indemnitor all books and records relating to the claim, and the parties agree to render to each other such assistance as may reasonably be requested in order to ensure a proper and adequate defense. An indemnitee shall not make any settlement of any claims that might give rise to liability of an indemnitor hereunder without the prior written consent of the indemnitor.

## Article 12.   GENERAL

### Section 12.1   Independent Contractor

Developer, in rendering performance under this Agreement, is acting and shall act solely as an independent contractor. RCL does not undertake by this Agreement or otherwise to perform any obligation of Developer, whether by regulation or contract. In no way is Developer to be construed as the agent or to be acting as the agent of RCL in any respect, any other provisions of this Agreement notwithstanding. Developer shall be responsible for any and all social security, unemployment, workers' compensation and other withholding taxes for any and all of its Employees/ICs or agents. Under no circumstances shall the employees of one party be deemed to be employees of the other party for any purpose.

### Section 12.2   Waiver.

No delay or failure by either party in exercising or enforcing any of its rights or remedies hereunder, in whole or in part, and no course of dealing or performance with respect thereto, shall constitute a waiver thereof in any other instance. In addition, the express waiver by a party hereto of any right or remedy in a particular instance will not constitute a waiver thereof in any other instance. All rights and remedies shall be cumulative and not exclusive of any other rights or remedies available at law or in equity.

### Section 12.3   Assignment.

Developer may not, without the prior written consent of the Senior Vice President, Marketing, assign, transfer, subcontract, or sublicense this Agreement or any obligation hereunder. Any attempt to do so in contravention of this subsection shall be void and of no force and effect.

### Section 12.4   Modification.

No change, deletion, modification, amendment, supplement to or waiver of this Agreement shall be binding upon a party hereto unless made in writing and signed by duly authorized representatives of both Parties.

### Section 12.5   Governing Law.

This Agreement shall be governed by, construed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions.

Section 12.6   *Severability.*

In the event that any provision of this Agreement shall for any reason be determined to be void, invalid, illegal or otherwise unenforceable in any respect by any court of competent jurisdiction, then, to the full extent permitted by law: (a) all other provisions hereof will remain in full force and effect and will be liberally construed in order to carry out the intent of the Parties hereto as nearly as may be possible; (b) such determination will not affect the remaining provisions of this Agreement; and (c) any court of competent jurisdiction will have the power to reform such provision to the extent necessary for such provision to be enforceable under applicable law.

Section 12.7   *Headings and Construction.*

The article, section and other headings contained in this Agreement are intended solely for convenience of reference and are not intended to be part of or affect the meaning or interpretation of this Agreement. The Parties hereby acknowledge that this Agreement is the product of negotiation between the Parties and/or their respective legal counsel and the Parties hereby agree that this Agreement shall not be construed against either party on the basis that the Agreement was drafted by one party or the other.

Section 12.8   *Liens.*

Developer agrees that neither Developer nor its employees shall have the right to assert Maritime liens on, or actions IN REM against any vessel owned or controlled or operated (directly or indirectly) by RCL for any matter arising in connection with this agreement or from employment on the vessel, including the Jones Act.

Section 12.9   *Entire Agreement.*

This Agreement, along with any and all exhibits, and attachments to this Agreement, constitutes the entire agreement between Developer and RCL relating the subject matter hereof and supersedes all prior or contemporaneous agreements, proposals, understandings and representations, written or oral, between the Parties with respect to the subject matter hereof. All terms and conditions of this Agreement shall govern and prevail over any additional or contrary terms and conditions contained in RCL's purchase orders, requests for quotations, payments or other writings, all of which are hereby rejected by Developer.

Section 12.10   *Counterparts.*

This Agreement may be executed in counterparts, each such counterpart shall be an original and altogether shall constitute but one and the same document.

Section 12.11   *Survivability.*

Articles 9, 10 and 11, Sections 12.5, 12.12 and any provision of this Agreement which by its content is intended to apply after termination of this Agreement shall survive its termination.

Section 12.12   *Notices*

Any notice required or permitted under this Agreement shall be in writing and shall be deemed given (a) if by hand delivery, upon receipt thereof, (b) if mailed, three (3) days after deposit in the United States mails, postage prepaid, certified mail, return receipt requested, (c) if by facsimile transmission, upon electronic confirmation thereof, (d) if by next day delivery service, upon such delivery, or (e) for notices for purposes of Article 2, by e-mail with a confirmation by appropriate

means. All notices shall be addressed as follows (or to such other address as either party may in the future specify in writing to the other):

In the case of Developer:

In the case of RCL:

HUGE LLC
45 Main Street, Suite 220
Brooklyn, NY 11201
Attn: CFO
Fax: 718-625-0203

Royal Caribbean International
1050 Caribbean Way
Miami, FL 33132
Attn: Sr. Vice President, Marketing

and

With a copy to: General Counsel
Fax: 305.539.0562

The Interpublic Group of Companies, Inc.
1114 Avenue of the Americas
New York, NY 10036

Attn: General Counsel
Fax:    212-704-2236

### Section 12.13  Force Majeure

Neither party shall be deemed in default or otherwise liable for any delay in or failure of its performance under this Agreement by reason of any Act of God, fire, natural disaster, accident, riot, act of government, restrictions of laws or regulations, strike or labor dispute, shortage of materials or supplies or of suppliers of goods or services, failure of transportation or communication, network or power failures or interruptions, mechanical or electrical breakdowns, or any other cause beyond the control of that party; provided that, in order to be excused from delay or failure to perform, such party must act diligently to remedy the cause of such delay or failure.

### Section 12.14  Promotion of Affiliation.

Subject to RCL's prior written approval, RCL grants Developer the usage right to include RCL in its list of representative clients and case studies, and may utilize representative creative content developed (as part of the Deliverables) for RCL, excluding any Confidential Information of RCL, for the purposes of marketing Developer's services to potential clients.

*Section 12.15  Non-Solicitation of Employees.*

RCL recognizes that Developer's Personnel constitute a valuable asset of Developer.  Accordingly, during the Term of this Agreement and for six months after the termination or expiration of this Agreement, RCL will not directly solicit or attempt to solicit any Developer Personnel.  For clarity, RCL shall not be in breach of this Section 12.15 if Developer's Personnel initiates employment discussions with RCL or responds to a RCL employment posting.  The remedy at law for any breach of this section may be inadequate and Developer shall be entitled to injunctive relief in addition to any other available remedy.

IN WITNESS WHEREOF, Developer and RCL have executed this Agreement in duplicate on the date and year first written above.

**ROYAL CARIBBEAN CRUISES LTD.**
d/b/a Royal Caribbean International

Signature: _____

Betsy O'Rourke

Senior VP, Marketing

Date: _____

**HUGE LLC**

Signature: _____

Name:   _Michael Manalota_

Title:    _Finance Director_

Date:    _6/1/2011_

(LEGAL)

Exhibit A

# ROYAL CARIBBEAN CRUISES LTD.

# INFORMATION TECHNOLOGY
# VENDOR COMPLIANCE
# REQUIREMENTS

CONFIDENTIAL

PROPERTY OF

ROYAL CARIBBEAN CRUISES LTD.

**Prepared by IT Compliance**

**February 2010**

## Compliance with Law

The objective of this document is to ensure that Royal Caribbean Cruises Ltd.'s ("RCL") guest and employee sensitive data is kept secure.  Loss of sensitive data could result in financial loss, bad publicity and legal liabilities.

The goal is to ensure that, at all times during the term of this Agreement, both Vendor and RCL each agree to comply with all applicable U.S. and international laws and regulations, including but not limited to all applicable Data Privacy, PCI, SOX and other regulations and modifications and updates thereto.

## Network Security/Confidentiality:

A. When a vendor handles RCL sensitive data:

(a) Ensure that only Authorized Users have access to RCL employee or consumer sensitive information.

(b) Ensure that all devices used by the vendor to access sensitive information are placed in a secure location and accessible only by authorized users, the devices have proper security measures in place to prevent theft of information or inappropriate storage or usage, and that such devices are secured when not in use.

(c) Ensure vendor takes all reasonable measures to prevent unauthorized access to the RCL Employee or Consumer sensitive information by any person other than an authorized user for permissible purposes.  Examples of ways to do this include, but are not limited to, restricting the knowledge of the vendor security codes, member numbers, user IDs, and any passwords the vendor may use.  Also, restrict access to those individuals based on "need to know", changing vendor passwords at least every 90 days, or sooner, and promptly removing access if an authorized user is no longer responsible for accessing the RCL sensitive data, or if the vendor suspects an unauthorized person has learned the password.

(d) In no event must the RCL sensitive information be accessed via any wireless communication device, including but not limited to, web enabled cell phones, interactive wireless pagers, personal digital assistants (PDAs), mobile data terminals and portable data terminals unless over internally vendor secured network. HUGE utilizes WPA2 wireless protocol for wireless security and will only allow access to managed devices, such as laptop, desktops, etc.

(e) The vendor is prohibited from using personal computer hard drives or portable and/or removable data storage equipment or media (including but not

limited to laptops, zip drives, tapes, disks, CDs, DVDs, software, and code) to store the RCL sensitive data unless for the purpose of standard vendor backup procedures. HUGE conducts onsite and offsite snapshots for backup. These offsite snapshots are electronically transferred to a facility in Colorado via IPSec link.

(f) If the vendor sends, transfers, or ships any RCL Information, the vendor must encrypt the RCL Information using the current RCL minimum standards in compliance with minimum regulatory requirements.

(g) Monitor compliance with the obligations of this Section, and immediately notify RCL if the vendor suspects or knows of any unauthorized access or attempts to access the RCL Consumer credit card data and / or other sensitive data.

(h)   Vendor must not ship hardware or software between the vendor's locations or to third parties without first deleting all RCL consumer sensitive information, security codes, user IDs, passwords, vendor user passwords, and any consumer information; or by first obtaining approval from an authorized RCL representative.

(i)   Vendor must show use of commercially reasonable efforts to establish procedures and logging mechanisms for systems and networks that will allow tracking and analysis, in the event there is a compromise; and maintain an audit trail history for at least three months on-line and one year off-line.

(j) Vendor must keep their systems up to date with the latest patches available.

(k)   Vendor must ensure their systems are scanned and any security vulnerability needs to be fixed prior to deployment or within the mutually agreed upon SLA.

(l) Vendor must use an anti-virus software package that must be kept up to date in order to protect the system and data from viruses, worms and other malicious software.

**Audit Rights:**
A.  **Access to Records:**RCL will have the right, at reasonable times during usual business hours and upon five (5) business days notice to the vendor, to audit, examine and make copies of, or extracts from, those business records necessary for RCL auditors to verify that vendor records were true and correct for the services performed under the Agreement. The vendor records that will be made available for inspection and copying hereunder will be neither more nor no less than those records reasonably sufficient to show that the services performed and reported to RCL were true, correct and did not contain substantial errors. In no event shall information revealing individual salaries of employees, profitability,

overheads, timesheets, non-billable expenses, or other proprietary information unrelated to the services provided by vendor to RCL, be made available to RCL.

B. **Access and Audit Process:** RCL will have the right, at reasonable times during usual business hours and upon five (5) business days notice to vendor, to audit and have access to process, policies and standards to ensure vendor complies with all applicable laws and regulations.

C. **Software Audit:** RCL will have the right, at reasonable times during usual business hours and upon five (5) business days notice to vendor, to audit the SDLC process to ensure compliance with all applicable laws and regulations.

D. **Auditors:** At RCL's option, any such audit or inspection may be performed by the RCL. All commercially reasonable and properly substantiated costs and expenses, including auditor and professional fees, relating to any audits, including audits of legal bills directly related to these audits under the agreement, will be borne by RCL.

E. **Domestic and International Governmental Audits:** In the event that either party receives notice from any U.S. or international federal, state or local government, or their legal representatives, of the intention to perform any audit implicating the services provided by vendor herein, said party will give notice to the other of said audit as soon as reasonably possible unless legally precluded from doing so. The parties will reasonably cooperate with each other in responding to said audit.


## Vendor Minimum Requirements

A. Vendor must follow any domestic or international laws in order to store, process and/or transmit sensitive data, including personal identifiable information (PII), HIPA, credit card data, etc.

B. The vendor systems need to follow the below requirements:

   - ❖ A Log Management Policy.
   - ❖ HUGE password policy of 90 day expiration with:
     - i. alphanumeric
     - ii. uppercase / lower case
     - iii. cannot be reused for last three passwords
   - ❖ Role Base Profiles - Data needs to be controlled and provided based on need-to-know.
   - ❖ Follow a Records Management Policy.
   - ❖ Support an AntiVirus solution.
   - ❖ Follow a Patch Management process.

❖ Follow a Change Management process.

2. Vendor shall:

❖ Remediate compliance issues as soon as possible.
❖ Sensitive data must be encrypted at rest and during transmission.
❖ Have a Computer System Security Incident Response Plan in case of a data breach.
❖ Present evidence of its Code Review Process, including disclosure of vulnerabilities.
❖ Present evidence of its Patch Management process.
❖ Ensure all remote access connections and services that connect to RCCL resources shall be used only by the individual authorized below and for authorized use only.
❖ Ensure that resources remain secure from damage and unauthorized use in accordance with any mutually agreed upon RCCL IT security policies and procedures, including but not limited to:
  • The Acceptable Use Policy
  • The RCCL Remote Access Policy
  • The RCCL Internet Security Policy
  • Computer Viruses, Worms and Malware Policy
  • All IT security and remote access policies of RCCL

3. Authorized users are also responsible for:

  • Ensuring that systems are secure and that anti-virus software is installed, running, and updated regularly on all end user remote access systems prior to using them.
  • Ensuring that, they utilize, maintain, and store highly sensitive information on RCCL servers when feasible.
  • Ensuring that all computer systems that are used to access the RCCL network are patched and up to date with all system security patches and service packs.

4. If authorized users require the use of remote access resources after they have left RCCL, such as for collaboration with RCCL staff, the users must have approval from an Executive or above.

5. RCCL will review all remote access accounts (at least) bi-annually to ensure that there is a continuing need for the remote access resources and privileges.

# Affidavit of Service

CIRCUIT COURT FOR THE ELEVENTH JUDICIAL CIRCUIT FOR MIAMI-DADE COUNTY, FLORIDA
CASE NO.: **13-020307 CA (15)**
Plaintiff : ROYAL CARIBBEAN CRUISES LTD.,
Defendant: HUGE, LLC,

> Network Provided
> Time - 04:31 PM
> Date - September 19, 2013
> GPS
> 40.754143 -73.983582

State of New York, County of New York

I **Navon Fahie - License No. 1321777** being duly sworn deposes and says that on **September 19, 2013 at 04:31 PM**, I served **Civil Action Summons, Complaint and Plaintiff's First Set of Interrogatories To Defendant** on **Huge, LLC C/o IPG** by delivering the documents to **Michael Plaut** who is the **Assistant General Counsel**  at **1114 Avenue of the Americas, 19th Floor, New York, NY  10036** which is their usual place of business.

Said service was effected in the following manner:

**Corporation/Business Entity**

A domestic/foreign corporation, by delivering thereat a true copy of each to **Michael  Plaut** personally.  The deponent knew said Corporation so served to be the domestic/foreign corporation described as **Huge, LLC C/o IPG**, and knew said individual, **Michael  Plaut** to be the **Assistant General Counsel** there of, authorized to accept service of process.

Deponent describes the individual served to the best of the deponents ability at the time and circumstances of service as follows:

Caucasian, Male, 5' 6", 140 - 150 lbs, Brown hair, Brown eyes, glasses, 35 - 40 years

Server Comments:

I declare under oath that I am 18 years of age or older and not a party to this action.

_____
Navon Fahie - License No. 1321777

Your File/Reference Number:
HOLLAND & KNIGHT LLP
**Notary Section**

Subscribed and affirmed, or sworn to before me this 23rd day of October, 20 13

Notary Public:_____
Commission Expires:_____

Exclusive Process Service
Post Office Box 858
New York, NY 10268

JUAN ROLDAN
Notary Public, State of New York
No. 01RO5077069
Qualified in New York County
Commission Expires April 28, 2015